**EXHIBIT    Q.** -3

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 100

1                    Silver - Direct - Ciotoli

2       basis for reporting this to the district attorney's

3       office?

4                    A.   Well, I -- I believe that there

5       is a -- I believe that there is a misdemeanor

6       offense called sexual misconduct.   That's my

7       recollection of what I thought of at the time.

8       And -- but that's about the extent of the thought

9       process that went into it.

10                   Q.   Okay.   Have you had occasion to

11      read Peggy Mousaw's 50-h examination?

12                   A.   I've read parts of it.

13                   Q.   What parts have you read?

14                   A.   And you know, I can't tell you

15      what page numbers, but I have culled through the

16      document, but not recently.

17                   Q.   Did you read or do any other

18      preparation for today's deposition?

19                   A.   I did.

20                   Q.   And what was that?

21                   A.   I did.   I did not read the 50-h

22      testimony in preparation for today's hearing.   I

23      read that 50-h testimony in the weeks immediately

24      subsequent to when that document was made

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 101

1                   Silver - Direct - Ciotoli

2       available, meaning when the -- the -- the reporter

3       had finished it.

4                        In preparation for today's

5       hearing I reviewed the -- the response to

6       Plaintiff's Interrogatories.  I reviewed Sections

7       103 and 105 of the Public Officer's Law.  And I

8       reviewed the -- our response to your request for

9       document production.

10                       Q.   Another individual involved in

11      this investigation is Troutman?  I'm not sure of

12      the name of the full company, Troutman and

13      Associates?

14                       A.   Yes.

15                       Q.   Okay.  Did you have any

16      involvement with retaining Troutman?

17                       A.   I spoke with Mr. Troutman on

18      the -- when I say Troutman, I spoke with a

19      representative from Troutman on the phone, yes.

20                       Q.   Did you retain Troutman?

21                       A.   I did not retain Troutman.

22                       Q.   Did you make --?

23                       A.   If -- if by retain you mean sign

24      a contract with Troutman, the answer to that

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                    Silver - Direct - Ciotoli

2       question is no.  That contract was signed by the

3       school district.

4                    Q.   Okay.  But you made the contact

5       to bring Troutman into the investigation?

6                    A.   I made the contact with Troutman,

7       yes.

8                    Q.   Unlike Travers, you did not make

9       the contact with Travers.

10                   A.   Correct.

11                   Q.   Why were you the person making

12      the contact with Troutman?

13                   A.   I don't think that people at that

14      point -- when I say people, Martin or perhaps Ms.

15      Travers, knew where to turn.  Mr. Bristol had,

16      during the course of the investigated --

17      investigation, indicated a desire to submit to a

18      lie-detector test.  So, that question -- that issue

19      was discussed between Martin and I.  And then I

20      took action in attempting to locate a proper party

21      to do that.

22                   Q.   Okay.  And what did you do to

23      locate that party?

24                   A.   In -- I had never previously

800.523.7887        08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 103

1                    Silver - Direct - Ciotoli

2       contracted for a private polygraph to be taken, or

3       any kind of lie-detector test.  I placed a

4       telephone call to then Deputy Undersheriff Kevin

5       Wells of the St. Lawrence County Sheriff's

6       Department.  And without discussing any aspect of

7       this case, or Ms. Mousaw by name, or even the

8       client that was at issue, being the

9       Colton-Pierrepont School District.  I asked him if

10      he was aware of any firm that would provide, in my

11      words, a lie-detector test or a polygraph test, for

12      hire.  He indicated to me -- his words were, "I

13      don't know why you would want to use a traditional

14      polygraph test.  The St. Lawrence County Sheriff's

15      Department uses V.S.A. or digital V.S.A."

16                         That's the first time I had heard

17      of that term, and he said, "In our experience it's

18      a better test, and it is -- it is more reliable."

19      I asked him was he aware of any such firm that

20      would contract for hire.  He indicated that he

21      was -- he did not.  He suggested the name of a

22      private investigatory firm in the northern New York

23      area.  I believe it's called the Quest Firm, and he

24      said, "You might want to give these people a call

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1              Silver - Direct - Ciotoli

2     and see if they know anything."

3                  Now, I called the people at the

4     Quest Law Firm.  And again, without discussing any

5     particulars of this case, without referring to

6     Peggy by name, without even letting them know my

7     client, I said "I -- I'm interested in securing the

8     services of someone who could perform a test.  Do

9     you any suggestions?"  They advised, based upon

10    their experience in other cases, they have used the

11    outfit that you just referred to.  They gave me the

12    telephone number, and I placed the telephone call.

13                  Q.  Okay.  And -- and -- and Troutman

14    is a firm, an organization from the state of

15    Virginia; correct?

16                  A.  You know, I don't know if it's

17    the state of Virginia, but I know it's not the

18    state of New York.

19                  Q.  Okay.  Did you wonder at all why

20    it is there was nobody in New York you could hire

21    for this?

22                  A.  I'm not so sure that I didn't

23    know there was anybody that I couldn't hire for

24    this.  I was given a name, as the result of a phone

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                    Silver - Direct - Ciotoli

2     call, and I contacted that individual.

3                    Q.  Okay.  And what did they tell you

4     in that initial contact?

5                    A.  What did who tell me?

6                    Q.  Whether you talked to Troutman

7     or -- or somebody else at Troutman's?

8                    A.  I spoke to Mr. Troutman, or the

9     individual at -- at Troutman's firm, and I said "I

10    have a client that needs to have a lie-detector

11    test performed."  Without using names, I -- I

12    discussed the circumstances of that with them,

13    meaning the nature of the client, the nature of the

14    allegations, and is that a service they would be

15    willing to render.  And he indicated yes, and I

16    said to him, "Well, what -- what does the fee look

17    like to do something like that?"  He gave me an

18    approximation, and -- and then I would have

19    contacted Martin after that telephone call.

20                   Q.  At -- at that time, did you have

21    any knowledge about whether they were licensed to

22    conduct private investigation services in New York

23    State or not licensed?  Did you --

24                   A.  No.

Associated Reporters Int'l., Inc. 08/18/2009, Colton, NY, Deposition of Andrew Silver          800.523.7887

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 106

1                    **Silver - Direct - Ciotoli**

2                    Q.  -- have any particular knowledge

3    one way or the other?

4                    **A.  No.**

5                    Q.  Did that become a concern of

6    yours around that time, about whether they were

7    licensed or not licensed?

8                    **A.  At that time, no, it did not**

9    **become a concern.**

10                   Q.  Okay.  Did Troutman say anything

11   to you, or whoever at Troutman's office, say

12   anything to you, we're not licensed in New York, or

13   we are licensed in New York?

14                   **A.  No, they never -- they never said**

15   **that there was any kind of problem with performing**

16   **the test in New York on any level.  There was never**

17   **a discussion about any licensure deficiencies or**

18   **any other obstacles that would preclude them from**

19   **conducting a test.**

20                   Q.  Since that time -- since the

21   initial contact, have you gained any knowledge that

22   them being unlicensed as a concern or a problem for

23   them doing this work in New York State?

24                   MR. LARKIN:  I'm going to object

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 107

1                    Silver - Direct - Ciotoli

2    to that because all of these questions assume that

3    there's some licensure that -- that's required,

4    and -- and I don't think that's been established.

5                    MR. CIOTOLI:  Well, I'm -- I'm

6    just asking his understanding, based on -- on what

7    he knows.  Either -- either he understands it or he

8    doesn't understand it.

9                    **A.  (Cont'g.)  Not as to the**

10   **licensure issue.**

11   BY MR. CIOTOLI:  (Cont'g.)

12                   Q.  So, as -- as we sit here today,

13   you have no -- no opinion on whether to conduct

14   this work they need to be licensed in New York

15   State or not.

16                   **A.  I have -- I have no opinion on**

17   **that.**

18                   Q.  Okay.  Have you ever conducted

19   any legal research, or anyone from your office

20   conduct any legal research, on whether such an

21   organization as Troutman, performing this type of

22   test or work, needs to be licensed in New York

23   State or not?

24                   **A.  Not on the licensure issue.**

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 108

1                    Silver - Direct - Ciotoli

2              Q.   On some other issue?

3              A.   There is another issue.

4              Q.   Okay.   What's that?

5              A.   The -- the extent to which a

6    digital voice stress analyzer test can be used in

7    the state of New York.

8              Q.   Okay.

9              A.   That's the issue.   That's not a

10   licensure issue; that's a statutory directive

11   that -- that indicates that these types of tests

12   cannot be used.

13             Q.   All right.   Let -- let me ask --

14             MR. LARKIN:   Under certain

15   circumstances.

16   BY MR. CIOTOLI:   (Cont'g.)

17             Q.   -- you --

18             A.   Under certain circumstances.

19             MR. CIOTOLI:   Okay.   Before we

20   get to -- and -- and Counsel, I want to thank you

21   for helping him answer the question.

22             MR. LARKIN:   Well --.

23             MR. CIOTOLI:   I know that we're

24   here for you to testify, and gain your knowledge

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 109

1                    Silver - Direct - Ciotoli

2      and information.

3                         MR. LARKIN:  We heard two days of

4      it about a month ago, so I thought I would join in.

5                         MR. CIOTOLI:  I don't think I

6      ever finished an answer for my client.  I might had

7      some fascinating colloquy with -- with -- with

8      Claudia on a few occasions, but I don't know that I

9      actually finished the answer but --

10                        MS. O'SULLIVAN:  So nice to be --

11                        MR. CIOTOLI:  -- that said --.

12                        MS. O'SULLIVAN:  -- so nice to be

13     fascinating.

14     BY MR. CIOTOLI:  (Cont'g.)

15                    Q.  Just to be clear, at -- at -- at

16     no time -- you've never made a determination about

17     whether Troutman needed to be licensed --

18                    **A.  No.**

19                    Q.  -- in New York State to do this

20     type of work?

21                    **A.  No.**

22                    Q.  Okay.  So, you don't know whether

23     they do need to be licensed or don't need to be

24     licensed?

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 110

1                    Silver - Direct - Ciotoli

2                    **A.   I've never made that**

3      **determination.**

4                    Q.   Okay.   Regarding the issue about

5      the use of this type of -- and -- and I'll just

6      call it a lie detector, and I know there is more

7      than one type of lie-detector test.   Well, I'll

8      call it a V.S.A.

9                    With regard to the use of the

10     V.S.A. in New York State, let me ask you first,

11     when did that first become a question or an issue

12     for you?

13                   **A.   Mr. O'Hara raised it in an e-mail**

14     **to me, sometime in August of 2006.**

15                   Q.   So, prior to that, whether this

16     type of evidence was admissible or could be used in

17     New York State, you had no knowledge, yes or no, on

18     that?

19                   **A.   I did not know that the section**

20     **of the Labor Law that deals with digital voice**

21     **stress analyzer tests existed.   Mr. O'Hara brought**

22     **that to my attention.**

23                   Q.   So, when you're retaining

24     Troutman and they're going to perform the V.S.A.,

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 111

```
 1                    Silver - Direct - Ciotoli
 2     you did not know, one way or another, about whether
 3     this test was legal in New York State, or not legal
 4     in New York State, or admissible or usable in New
 5     York State?
 6                    A.   I did not know that that statute
 7     existed that addresses the use, under certain
 8     circumstances, of the digital voice stress analyzer
 9     test.
10                    Q.   Did you ever ask anyone in your
11     office to do some legal research?  And again, prior
12     to getting an e-mail from Mr. O'Hara, did you ever
13     ask anyone in your office is this -- is this legal?
14     Can we do this is?  Is this appropriate?  Did you
15     ever ask anyone in your office to look into that?
16                    A.   No, I did not.  I asked somebody
17     outside the office.
18                    Q.   When you did have your office or
19     yourself do this research --
20                    A.   Yeah.
21                    Q.   -- what did you determine?
22                    A.   The -- the question that was put
23     to this individual was whether or not the digital
24     V.S.A. analysis could be admitted at a hearing of
```

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 112

1                    Silver - Direct - Ciotoli

2      this nature, meaning a board-removal hearing.

3                    Q.   And -- and what were you informed

4      of?

5                    A.   I was informed that it could be.

6                    Q.   Under all circumstances or

7      certain circumstances?

8                    A.   Under -- under these

9      circumstances.

10                    Q.   Okay.  And -- and what are these

11      circumstances that led you to the conclusion

12      that -- that V.S.A. information would be

13      admissible?

14                    A.   The -- the circumstances

15      involving the allegations that were being made by

16      Mr. Bristol.

17                    Q.   So you, through your office,

18      reached that conclusion based on legal research.

19      Now, under the New York Labor Law what Mr. Bristol

20      or -- or what conclusions are -- were reached in

21      this V.S.A. test, were going to be admissible in

22      this removal hearing?

23                    A.   Yeah, I did.  When we're

24      getting -- if you're talking about the point in

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 113

```
 1                    Silver - Direct - Ciotoli
 2     time in preparation for the actual hearing and
 3     the -- and -- and the use -- the actual use of
 4     those V.S.A. test results at the hearing, I did
 5     perform that kind of investigation.  And one of the
 6     things that I did was to obtain the legislative
 7     jacket for the bill in Albany.  And that bill
 8     contains a number of different things about the
 9     intent of this particular statute, what it was
10     designed to address, and the concerns back at that
11     time, to my recollection was, back in the early
12     '70s, of what that statute was designed to protect
13     against.
14                    Q.  And -- and what was that, what
15     did -- what did you learn from the legislative
16     jacket?
17                    A.  In -- in general that that
18     section of the Labor Law was born of a
19     right-of-privacy issue.  And the problem that was
20     occurring in the '70s is that employers were
21     surreptitiously conducting V.S.A. tests of their
22     employees, to use the statements against those
23     employees, in whatever kind of disciplinary
24     proceeding the employer would use against them.
```

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 114

1                    Silver - Direct - Ciotoli

2                         The problem that the legislature

3       saw was that, with the V.S.A. test, you could do --

4       you could conduct a V.S.A. test without actually

5       hooking a person up to a machine, meaning the

6       person had no idea that their statements may be

7       recorded.  So when I say to you it's a right to

8       privacy issue, that's what all the correspondence

9       and the concerns were for the New York State

10      legislators, at the time that statute was enacted.

11                        In the V.S.A. test, in this

12      particular issue, there's a distinction, as I

13      understand it, that -- a technical distinction, in

14      that Mr. Bristol was actually connected to this

15      machine in some fashion.

16                    Q.  So, he was agreeing to or

17      volunteering to do this?

18                    A.  Correct.

19                    Q.  And -- and to you that was the

20      dividing line between whether it was admissible or

21      not admissible?

22                    A.  No, it's not the dividing line.

23      It was certainly a factor, but it's not the

24      dividing line.

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                    **Silver - Direct - Ciotoli**

2                    Q.  Okay.  But did you -- did you

3     have another dividing line or --?

4                    **A.  Are we -- the factor, in**

5     **certainly being connected to the machine, the**

6     **factor that -- that he was requesting and**

7     **voluntarily consented to the test.  The fact that**

8     **it was not surreptitiously taken from him, were all**

9     **factors.  I can't tell you that they were the sum**

10    **and substance of the factors, but that was all part**

11    **of the analysis.**

12                   Q.  Okay.  I'm -- I'm looking at the

13    Labor Law Section, 734?

14                   **A.  Uh-huh.**

15                   Q.  And I'll read subparagraph 1.

16                   **A.  I know, it says for any purposes.**

17                   Q.  (Reading)  "It shall be unlawful

18    for any individual to knowingly administer or

19    participate in the administration of a

20    psychological stress evaluator examination of an

21    employee or perspective employee, as defined in

22    this Section."

23                   There's nothing there about

24    whether it's surreptitious or not surreptitious, or

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                Silver - Direct - Ciotoli

2    whether they volunteered for it or didn't volunteer

3    for it.

4                 **A.   That's how the statute reads.**

5                 MR. LARKIN:  Object to the form

6    of that.

7    BY MR. CIOTOLI:  (Cont'g.)

8                 Q.  Okay.  So, based on the plain

9    reading of the statute, this -- this V.S.A., the

10   psychological stress evaluator, is -- is illegal in

11   New York State, would you agree with that

12   statement?

13                MR. LARKIN:  I -- I object to the

14   form of that question.

15   MR. CIOTOLI:  (Cont'g.)

16                Q.  You can go ahead.

17                 **A.   No, that is your interpretation.**

18   **It is not, per se, illegal in New York State.**

19   **That's not what the statute says.**

20                Q.  Okay.  Under what circumstances

21   is it legal in New York State?

22                 **A.   One of the circumstances would be**

23   **the use of that test by -- which is not the case**

24   **here, but use of that test by police agencies, such**

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 117

1                    Silver - Direct - Ciotoli

2     as the St. Lawrence County Sheriff's Department.

3                    Q.   Right.  So that -- so a police

4     authority can use the test?

5                    A.   I think that's right, yeah.

6                    Q.   All right.  And -- and this kind

7     of involves more employer-employee type situations,

8     or --

9                    A.   Right.

10                   Q.   -- private situations?

11                   A.   And -- and -- and that test would

12    also not apply to individuals who are not

13    employees.  And at the time this test was

14    conducted, the nature of Mr. -- I wasn't certain

15    whether or not Mr. Bristol was actually an employee

16    or an independent contractor.  I never delved into

17    that particular issue.  But having said that, I

18    wasn't even aware that this statute existed, until

19    August of 2006, when Mr. O'Hara brought it to my

20    attention.

21                   Q.   Okay.  Let me represent to you,

22    or -- or -- we could even say it as a hypothetical,

23    if Mr. Bristol is an employee of this school

24    district, would you agree that, under the -- the

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 118

1                    Silver - Direct - Ciotoli

2       Labor Law code section we're referring to, that

3       this V.S.A. would be illegal in New York State?

4                    MR. LARKIN:   You're talking about

5       the V.S.A. of Mr. Bristol?

6                    MR. CIOTOLI:   Yes.

7       BY MR. CIOTOLI:   (Cont'g.)

8                    Q.   If he's an employee of this

9       school district?

10                   **A.   If Mr. Bristol is an employee of**

11      **this school district, I would say yes.**

12                   Q.   Okay.   And -- and it says that

13      "Any individual violating any provision of this

14      section shall be guilty of a class B misdemeanor

15      upon the first conviction," and then some further

16      language.   Do you know what a class B misdemeanor

17      is?

18                   **A.   I certainly do.**

19                   Q.   Okay.   What is that?

20                   **A.   It's a -- there are two**

21      **classifications of -- of misdemeanors in New**

22      **York -- actually three.   There are class A**

23      **misdemeanors, there are class B misdemeanors, and**

24      **there are unclassified misdemeanors.**

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 119

1              Silver - Direct - Ciotoli

2                   A class B misdemeanor is one that

3      is punishable by a maximum of ninety days in jail,

4      and can result in the imposition of a probationary

5      sentence up to one year, or a combination of fines,

6      incarceration, and probation.

7                   Q.  And again, this information was

8      first brought to your attention by an e-mail from

9      Mr. O'Hara?

10                  A.  That's correct.

11                  Q.  If you were aware of this statute

12     at the time that you were contacting Troutman, or

13     arranging the V.S.A., would you have stated that to

14     the school district, we should not do this V.S.A.,

15     based on this statute?

16                  A.  If I had to do it all over again

17     would I -- would I conduct the V. -- have the

18     V.S.A. conducted?  The answer is no.  I would have

19     chosen a different route.

20                  Q.  Okay.  So, twenty-twenty

21     hindsight, you now realize that the V.S.A. was an

22     improper way to go?

23                  A.  Twenty-twenty hindsight, would

24     have done it a different way.

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 120

1                    Silver - Direct - Ciotoli

2              Q.   Okay.  I know there's more than

3    one lie-detector test.  The -- the V.S.A., the

4    psychological stress evaluator, I think involves

5    the individual talking into, you know, a

6    microphone, and then having their -- having

7    their -- their tone or their whatever measured,

8    based on their voice.

9                    The other type of lie-detector

10   test is when they hook you up and they check your

11   pulse and check your blood pressure and do those

12   things.  Obviously something you can't do

13   surreptitiously, because you've got to be hooked up

14   to it.

15             A.   Uh-huh.

16             Q.   Are you aware of that difference?

17             A.   I am aware of that difference.

18             Q.   At the time were you aware of

19   that difference?

20             A.   I don't recall.

21             Q.   Okay.  I mean, were you making a

22   determination on whether this was going to be a

23   situation where the person gets hooked up to the

24   machine?

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 121

1                    Silver - Direct - Ciotoli

2              A.   I was making the recommendation

3    based upon the suggestions of Deputy Sheriff Wells.

4              Q.   Are you aware of Travers, in her

5    report, relying on any of the findings of the

6    V.S.A. in making the conclusions of her report?

7              A.   I'm -- I'm aware that -- I think

8    she mentions that test in her report.

9              Q.   As -- as one --

10             A.   And I know --

11             Q.   -- of the --

12             A.   -- I know --

13             Q.   -- factors --.

14             A.   -- I know what the report says,

15   so I know she mentions the V.S.A. test in her

16   report.

17             Q.   So it's one of the factors she

18   included and --

19             A.   Her --

20             Q.   -- and considered?

21             A.   -- it's -- what she considered is

22   stated within the confines of her report.  I'm

23   assuming.  I read it, just like you read it.

24             Q.   And if you knew the law at the

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 122

1                    Silver - Direct - Ciotoli

2      time, you -- you would not have used the V.S.A. at

3      all; correct?

4                    A.   I've already answered that.

5      That -- that question is yes, I would have done

6      something different.

7                    Q.   And do you have a thought right

8      now what -- what it is that you would have done

9      differently?

10                   A.   I don't have any thoughts.

11                   Q.   Okay.  Do you know if Ms.

12     Travers -- you mentioned earlier how Ms. Travers

13     reached a negative conclusion regarding Peggy

14     Mousaw, because she wouldn't submit to an

15     interview.

16                   A.   Uh-huh.

17                   Q.   Do you also -- are aware that Ms.

18     Travers reached a negative conclusion because Ms.

19     Mousaw would not submit to the V.S.A.?

20                   A.   I know what her report says.

21                   Q.   Okay.  And is that one of the

22     things she states?

23                   A.   I -- I think there's language to

24     the effect that she considered the effects of -- of

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 123

1                    Silver - Direct - Ciotoli

2       the V.S.A. test.  And I'm not going to speak for

3       her report.  It's -- it's written right in front of

4       us.  And that's -- that's Plaintiff's One.

5                    Q.  Right.  But you had mentioned

6       earlier that you would have liked to see some more

7       follow-up or clarity, one being the -- the

8       technical aspects of the log entry, and the other

9       being her -- her refusal to submit to an interview.

10      Would you also put the V.S.A. in that category, as

11      something that you would have preferred not to see

12      in Travers' report?

13                   A.  It doesn't -- it -- would I have

14      liked to see the V.S.A. -- I think that the report

15      should have reflected what happened.  Your question

16      previously was would I have proceeded in this

17      V.S.A. issue; the answer is, in hindsight, I did

18      not.  But I think Ms. Travers' report has reflected

19      everything that occurred.

20                   Q.  So, what -- what Mr. O'Hara then

21      sent to you in that e-mail was essentially correct;

22      correct?

23                   A.  I think --

24                   MR. LARKIN:  Objection to form.

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1              Silver - Direct - Ciotoli

2                   A.   (Cont'g.)  -- I think what he

3      send me was an e-mail, "Andrew, before you consider

4      using the V.S.A. test results at the hearing, you

5      might want to conduct a review of 736 of the Labor

6      Law," or whatever the proper section is.  I think

7      that's how he addressed it.

8      BY MR. CIOTOLI:  (Cont'g.)

9                   Q.   Okay.  I know the removal hearing

10     only went so far.

11                  A.   Yeah.

12                  Q.   And -- and that it was not

13     completed?

14                  A.   That's right.

15                  Q.   I don't believe the hearing

16     officer ever actually addressed whether or not it

17     was admissible or not?

18                  A.   No, I told Mr. O'Hara I wasn't

19     going to use the V.S.A. test, prior to the

20     commencement of the hearing.  Sent him a letter to

21     that effect.

22                  Q.   Right.  So, you -- then you made

23     a determination, before the removal hearing would

24     commence, that -- that you weren't going to use the

Page 125

1               Silver - Direct - Ciotoli

2    V.S.A. test at all?

3               A.  I -- I made the -- I gave an --

4    an opinion to Martin, in preparation for the

5    hearing, that we would not be using the V.S.A.

6    test.  It was clearly going to be another issue

7    that was going to be raised at this hearing, that

8    there was a question, and there would be an

9    allegation that it was an illegal test.

10              And that at that juncture Ms.

11   Mousaw had filed a Notice of Claim declaring her

12   intention to sue the school district.  So, all of

13   those factors being what they were, recognizing

14   that this was going to be a contention --

15   contentious issue, and recognizing that at the end

16   of the day, that this case came down, essentially,

17   to the creditability of two individuals, a tactical

18   decision was made not to muddy the waters with

19   another issue, and not to use the V.S.A. test

20   results.

21              Q.  Okay.  So ultimately, the whole

22   business with Troutman and the V.S.A. was a total

23   waste of time and money?

24              MR. LARKIN:  Objection.

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 126

1                    Silver - Direct - Ciotoli

2               A.  (Cont'g.)  **That is not my**

3     **opinion, no.**

4     BY MR. CIOTOLI:  (Cont'g.)

5               Q.  Okay.  Do you believe that there

6     was any benefit served or achieved by having

7     Troutman conduct this test?

8               A.  I do.

9               Q.  And what was that?

10              A.  **Well, it -- it's -- it's an**

11    **indicator.  And I recognize what the statute says,**

12    **but it's an indicator in a case that -- that is**

13    **essentially a he-said/she-said scenario, that Mr.**

14    **Bristol -- Mr. Bristol was not being deceptive when**

15    **he made these allegations.**

16              Q.  You -- you mentioned kind of

17    reading the legislative jacket to get some intent

18    or purpose behind the statute?

19              A.  **Right.**

20              Q.  Did you also ever see any

21    information that, as a test, the V.S.A. had been

22    discredited, or had been scientifically

23    discredited?

24              A.  **Yeah.  In -- in the early '70s**

Associated Reporters Int'l., Inc. 08/18/2009, Colton, NY, Deposition of Andrew Silver          800.523.7887

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 127

1                    Silver - Direct - Ciotoli

2      there was a significant amount of correspondence in

3      the legislative jacket that talked about the

4      inherent reliability or unreliability of pure voice

5      stress analyzation as they then existed in the

6      early '70s.

7                    Q.  And -- and are you aware of that

8      scientific analysis or opinion of the V.S.A. test

9      changing over --

10                   A.  I'm not --

11                   Q.  -- the years?

12                   A.  -- I'm not aware -- I'm only

13     aware of what I was told by Deputy Sheriff Wells.

14     And his statement to me during that phone call was

15     "We have used both.  We find the digital V.S.A. to

16     be a more reliable test than the traditional

17     polygraph."

18                   Q.  Did -- did he ever say anything

19     to you about be wary of -- of using it in an

20     employer-employee situation --

21                   A.  No.

22                   Q.  -- or in a private situation?

23                   A.  No, never.  Never.  Never -- the

24     issue was never raised.

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1              **Silver - Direct - Ciotoli**

2                   Q.  And you -- you've -- you

3      mentioned reading a little bit of Peggy Mousaw's

4      50-h examination.

5              **A.  Yeah.**

6                   Q.  Have -- have you read the

7      information on what she did when asked what

8      occurred on October 27th, 2005?

9              **A.  I may have read it, but I -- I --**

10     **I don't recall right now the details of her 50-h**

11     **examination.  Since I didn't read it today, so, no,**

12     **I don't recall.**

13                  Q.  If -- if you could look at what's

14     been marked as Plaintiff's Four, which is the

15     sexual-harassment complaint form?

16             **A.  Yeah, I see it.**

17                  Q.  And -- and would it would be true

18     that you -- you first read this soon after February

19     16th, or on the day of February 16th?

20             **A.  I -- I would have read this**

21     **within days of it being generated.  That's a true**

22     **statement.**

23                  Q.  Was there anything in the

24     sexual-harassment complaint form that gave you any

800.523.7887        08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 129

1                    Silver - Direct - Ciotoli

2      pause or concern about the veracity of the

3      allegation?

4                    A.   On its face, just reading the

5      document?

6                    Q.   Yes.

7                    A.   No.

8                    Q.   Was it a concern of yours, during

9      that time period, that he's making this report, you

10     know, some four months after it occurred?

11                   A.   It certainly raised the question

12     why wait so long.  And --.

13                   Q.   And you -- you had that question

14     from the beginning, why --

15                   A.   Well sure.

16                   Q.   -- wait so long?

17                   A.   Well, sure.  Sure.

18                   Q.   Did you ever talk to Mr. Bristol

19     about why wait so long?

20                   A.   I did, in preparation for the

21     removal hearing.

22                   Q.   And he -- he gave you his

23     explanation?

24                   A.   He gave me an explanation, he

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 130

1                    Silver - Direct - Ciotoli

2       did.

3                    Q.  Which he repeated at the removal

4       hearing?

5                    A.  Yes, he did.

6                    Q.  And -- and looking at it -- let

7       me ask you this:  Were -- were you concerned at

8       all, or did you gain knowledge at that time, around

9       February 16th or soon thereafter, that most of the

10      handwriting here is David White's handwriting?  Did

11      you know that at the time?

12                   A.  I became aware of that through

13      Mr. O'Hara's cross-examination of Mr. Bristol,

14      during the first two sessions of the removal

15      hearing.

16                   Q.  Okay.  So the first time you

17      heard that this was not actually Jeff Bristol's

18      handwriting, again, was at the removal hearing?

19                   A.  I think that's a fair statement.

20                   Q.  Okay.  Did that -- does that give

21      you any pause or concern about the veracity of this

22      document, the fact that it's not in the

23      complainant's own handwriting?

24                   A.  No, provided that the complainant

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                    Silver - Direct - Ciotoli

2     who signs this has been given an opportunity to

3     review the document, and -- and make sure that what

4     is written on their behalf is accurate.  So,

5     provided that opportunity was given to him, and

6     provided that this statement represents the truth,

7     which is what Mr. Bristol represented to me on a

8     number of different occasions in preparation for

9     that hearing, I don't share that concern.

10                   Q.   Okay.  I -- I -- I believe

11    through Mr. Bristol's testimony at the removal

12    hearing, that we did determine that there is some

13    of his handwriting on this document, and part of it

14    being on or about three-quarters of the way down,

15    where it "In a.m.," which seems to be inserted at

16    the --

17                   A.   Yeah.

18                   Q.   -- top of the line.  Do you --

19                   A.   Yeah.

20                   Q.   -- see that?

21                   A.   I see that.  That's near the --

22    that's the bottom third of the paragraph, "ten

23    twenty-seven," it says "'04," and then, paren, "in

24    a.m."  Is that what you're look -- is that where

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 132

1                    Silver - Direct - Ciotoli

2      you're looking?

3                    Q.   Exactly.

4                    A.   Yeah, I do see that.

5                    Q.   Okay.   First -- first I'd point

6      out that they got the year wrong of 2004; correct?

7                    A.   I see that they have 2004, yeah.

8                    Q.   Yeah.   Did -- well, when did you

9      first notice that they got the year wrong?

10                   A.   I -- I noticed that as a result

11     of -- I believe Mrs. LeMay, who was Peggy's counsel

12     at that point in time, raised that issue to me in a

13     letter.   She's saying the date here may not be

14     correct.   It may be -- is it '05 or is it '04?

15     What date is it really?   So that's my first

16     recollection of -- of seeing that, and saying yeah,

17     the date might -- might not be right.

18                   Q.   Okay.   Did it concern you at all

19     or give you any pause that he makes references to

20     it being just in the a.m.?   In other words

21     anywheres else from, you know, I don't know, six

22     a.m. to noon.

23                   A.   No, it did not.

24                   Q.   Okay.   That he could not narrow

800.523.7887            08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                  Silver - Direct - Ciotoli

2    it down a little bit more?

3              A.   It -- it did not.  I mean,

4    it's -- it -- it -- considering the -- perhaps,

5    the -- the length of time that had gone by between

6    when the allegations came out and when the incident

7    allegedly occurred, it doesn't surprise me that he

8    couldn't pin it down to an exact hour.  And it's --

9    it's been my experience, in -- in -- in other

10   positions that I've held, that typically victims --

11   alleged victims of -- of -- of crimes have --

12   aren't able, in some circumstances, to pin down

13   exactly when the crime occurred.  Doesn't, in and

14   of itself, mean that that incident didn't take

15   place.

16             Q.   And do you consider this a crime?

17             A.   I don't.

18             Q.   But -- but you would agree

19   it's -- it's a traumatic event, that somebody came

20   into his construction trailer and grabbed his

21   crotch and said "This is what I want"?

22             A.   It -- it -- I -- I think it's a

23   terribly unfortunate event.

24             Q.   Right.  And -- and you think

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 134

1                    Silver - Direct - Ciotoli

2    it -- it might stick in somebody's mind whether it

3    occurred first thing in the morning or later in the

4    morning?

5                    MR. LARKIN:  Objection.

6              A.  I don't know what Mr. Bristol

7    thought.  I only know what he told me.

8    BY MR. CIOTOLI:  (Cont'g.)

9              Q.  Okay.  And the only time you

10   talked to him was in preparing for his testimony at

11   the removal hearing; correct?

12             A.  That -- that is my recollection.

13   I did not have any detailed conversations with Mr.

14   Bristol until we really started the preparation

15   phase of it.  I just -- I just don't recall sitting

16   down with him and walking through his statement

17   until we got to the preparation phase.

18             Q.  But again, going back to February

19   of 2006, the fact that he just says in the a.m.,

20   which again, could be a -- you know, a

21   four-to-six-hour type window, that -- that was not

22   a concern of yours at the time?

23             A.  No, it's -- it's an issue what

24   have to be dealt with, certainly, at the hearing.

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                    Silver - Direct - Ciotoli

2    **But is it a red flag that the entire statement is a**

3    **complete fabrication?  No, it's not.**

4                    Q.  But again, another credibility

5    issue for Mr. Bristol.

6                    **A.  Well, it's something he's going**

7    **to have to answer.**

8                    Q.  Okay.

9                    **A.  Something he would have to answer**

10   **for at the hearing.**

11                   Q.  Okay.  And at the hearing, he

12   actually gave testimony other than just in the

13   a.m.; is that correct?

14                   **A.  I haven't read his transcript but**

15   **that may be correct.  I just don't recall.**

16                   Q.  Okay.  Do you -- do you have a

17   recollection of him saying, "I don't remember if it

18   was in the a.m. or in the morning right now.  It

19   could have been some other time"?  Do you have a

20   recollection of that?

21                   **A.  He might have said that during**

22   **the hearing.**

23                   Q.  Right.  Actually he repeated it

24   twice.  Do you recall that?

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 136

```
 1                 Silver - Direct - Ciotoli

 2                 A.  I -- I recall that he said

 3       something to that effect.  I can't recall how many

 4       times he said it, but I do remember him saying

 5       words to that effect during the hearing.

 6                 Q.  Okay.  As far as you're concern

 7       about his credibility or veracity, does -- does

 8       that add any concern that he went from saying it's

 9       in the a.m. to I don't remember when it occurred,

10       it could have occurred basically any time during

11       the day?

12                 A.  Well, at that stage we're already

13       at the hearing.  That's for the fact finder to

14       determine, not me.

15                 Q.  Okay.  But as an attorney for the

16       school district, I mean, you're -- you're trying to

17       prove a case.  You're trying to get a Board member

18       removed from her Board seat.

19                 A.  I'm not trying to do anything.

20                 Q.  You -- you -- well, you are the

21       attorney for the school district; right?

22                 A.  I'm -- I'm -- I'm prosecuting a

23       set of accusations that the district had reason to

24       believe may have been true.
```

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 137

1                   **Silver - Direct - Ciotoli**

2                   Q.  Okay.  And -- and you just had

3      your -- your -- your star witness, basically, go

4      from saying this occurred in the a.m. to I'm -- to

5      I don't know when it occurred.

6                   **A.  That happened --**

7                   **MS. O'SULLIVAN:  Objection.**

8                   **A.  (Cont'g.)  -- at the hearing.**

9      BY MR. CIOTOLI:  (Cont'g.)

10                  Q.  Right, happened at the hearing.

11                  **A.  It occurred no time prior to the**

12     **hearing.**

13                  Q.  So -- so when he made those

14     statements at the hearing, that was a complete

15     surprise to you?

16                  **A.  I was surprised to hear that.**

17                  Q.  Okay.  You were shocked that he

18     said that; weren't you?

19                  MR. LARKIN:  Objection.  He

20     already answered that he was surprised; you don't

21     need shocked.

22                  MS. RYAN:  I'm on the jury, it's

23     not impressing me.  Let's move on, Mr. Ciotoli.

24     Get to the point.

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 138

1              Silver - Direct - Ciotoli

2     BY MR. CIOTOLI:   (Cont'g.)

3              Q.  Did you talk to him afterward

4     about his -- the level of his memory?

5              A.  No, I don't believe I did.

6              Q.  Did you talk to him at all about

7     the fact that you have a complaint form that says

8     in the a.m. and now you're telling the hearing

9     officer I don't know when it was?

10             A.  I don't believe I did.  I believe

11    Martin and I had a discussion about that.  You

12    know, he testified to what he testified do -- to

13    during the hearing.  It was up to the hearing

14    officer to assess what the impact and what the

15    significance of that was.  Me going to Mr. Bristol,

16    and either getting upset with him, or pointing out

17    that error, served no purpose in the continuation

18    of that hearing.

19                  I informed the hearing officer, I

20    believe, that Mr. Bristol was done and he wasn't

21    going to testify.  So, if I take Mr. Bristol out in

22    the hallway and have a conversation that oh, you

23    know, you really testified inconsistently to what

24    you told me previously, and then I put him on the

800.523.7887        08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 139

1                  Silver - Direct - Ciotoli

2      stand after that, it looks for what it is.  It

3      looks like we are attempting to manufacture

4      testimony, and I'm not going to do that.

5              Q.  Okay.  But -- but there's also

6      trying to rehabilitate a witness, and -- and trying

7      to bring the witness back to point.

8              A.  There --.

9              Q.  You didn't consider that?

10             A.  No, I did not consider that.

11             Q.  Okay.  Regarding the V.S.A., by

12     the way, do you know how many questions Troutman --

13     I -- actually, I believe it was Roger Cleese

14     (phonetic spelling), if I'm --

15             A.  Yeah.  Right.

16             Q.  -- pronouncing that correctly?

17             A.  Right.  That's right.

18             Q.  Do you know how many questions

19     they asked Mr. Bristol?

20             A.  I don't.

21             Q.  Okay.  Did -- did Mr. Cleese ever

22     confer with you at all about these are the

23     questions I'm going to ask?

24             A.  I don't recall him having done

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                    Silver - Direct - Ciotoli

2      that, no.

3                    Q.  I -- I mean, questions like, you

4      know, did this happen in the morning or in the

5      afternoon; you had no knowledge of that?

6                    A.  I -- I did not know the line of

7      questioning.  I don't recall seeing the line of

8      questioning of -- of Mr. Bristol.

9                    Q.  Have you ever seen anything since

10     that time which tells us how many questions were

11     asked?

12                   A.  I can't state with certainty that

13     I have.  You know, a document like that, I -- I

14     don't know if that issue surfaced during the

15     hearing or not.  I just can't remember.

16                   Q.  Okay.  How about during the

17     motion practice in this lawsuit?  Did you see

18     anything which indicated that Mr. Bristol was only

19     asked two questions?

20                   A.  I -- I don't believe that I did.

21                   Q.  Okay.

22                   A.  And there wasn't much of -- as --

23     as to the characterization of the motion practice,

24     there wasn't much as it pertained to the

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 141

1                   Silver - Direct - Ciotoli

2       admissibility of the V.S.A.  Meaning there weren't

3       formal documents filed in front of the hearing

4       officer.

5                   Q.  But was -- was it ever brought to

6       your attention that in conducting the V.S.A. Mr.

7       Cleese or Mr. Troutman were saying that they only

8       asked Mr. Bristol two questions?

9                   A.  I -- I -- I don't recall being

10      aware of that, no.

11                  Q.  Does that raise any concern for

12      you, or -- or -- or pause, that you have a V.S.A.

13      to determine the -- the veracity or not of the

14      sexual-harassment charge, and that only two

15      questions are being asked to determine that?

16                  A.  At this point, no, because it's

17      after the fact.

18                  Q.  And you had already decided not

19      to use it at the removal hearing anyways?

20                  A.  Fair statement.

21                  Q.  Okay.  Do you recall ever talking

22      to Peggy Mousaw about the zoning issue with her

23      house?

24                  A.  I do recall speaking to Peggy

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 142

1                    Silver - Direct - Ciotoli

2       about an issue she was having before the zoning

3       board with her house.  And my recollection is that

4       house was somewhere in the town of Colton, on a

5       body of water somewhere here, so yes, I do remember

6       that.

7                    Q.  Okay.  Well, I mean, was that a

8       conversation that occurred in your office, in the

9       county building, here at the school; do you

10      remember where that was?

11                   A.  I do.  It was a conversation that

12      occurred in the county attorney's office building,

13      in the office suite, in a small conference room on

14      the second floor.

15                   Q.  Do you know how that conversation

16      came up or how it was initiated?

17                   A.  I -- I do.  My recollection is

18      that -- is that -- I don't know if it was on the

19      same date that Peggy and I had that conversation.

20      My recollection is seeing Peggy out on the street

21      in front of the county legislature building, Peggy

22      generally saying I'm having this particular problem

23      with my -- with my camp property, or my house

24      property, generally explaining to me what the

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 143

1                    Silver - Direct - Ciotoli

2      nature of the problem was.  And I offered to her,

3      if you want to come by the county attorney's office

4      and chat about it, just bring over what you've got

5      and we'll take a look at it.

6                    Q.  And did she do that?

7                    A.  She did do that.

8                    Q.  Okay.  How long did you spend

9      with her at your office?

10                   A.  No longer than a half hour.

11                   Q.  Okay.  And -- and this -- the

12     initial conversation, do you remember when that

13     occurred, the one out on the street?

14                   A.  No, I don't.

15                   Q.  Was it in the a.m. or afternoon?

16                   A.  I -- I don't recall.  I'd be

17     guessing if I did.  I just don't recall when that

18     occurred.

19                   Q.  Okay.  And again, no -- no memory

20     about whether this was kind of a

21     first-thing-in-the-morning type thing, or a

22     later-in-the-day type thing?

23                   A.  The conversation with Peggy in

24     the street?

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 144

1                    Silver - Direct - Ciotoli

2              Q.   Yes.

3              A.   I don't recall.  I just don't

4    recall.

5              Q.   Okay.  And then did the meeting

6    in your office take place immediately thereafter?

7              A.   I don't recall that either.

8              Q.   Okay.  So you don't remember if

9    it was -- if she came by an hour later or came by

10   five minutes later?

11             A.   I don't.  And I don't even -- I

12   don't even remember whether or not it occurred on

13   the same day.

14             Q.   Okay.  But you do recall a

15   conversation on the street?

16             A.   I do recall a conversation on the

17   street.

18             Q.   And a conversation in your

19   office?

20             A.   Yes, I do.

21             Q.   If you were to put those two

22   times together -- well, let's do this first:  The

23   conversation on the street, how long did that last?

24             A.   Three minutes --

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

1                    **Silver - Direct - Ciotoli**

2                    Q.  Okay.

3                    **A.  -- max.**

4                    Q.  Okay.  The conversation in your

5      office, how long did that last?

6                    **A.  No more than one half hour.**

7                    Q.  Okay.  Was -- was she expressing

8      to you a concern about this zoning matter because

9      she had a meeting with the zoning board that

10     evening?

11                   **A.  She told me -- I don't know if I**

12     **remember her saying she had a zoning board meeting**

13     **that night, but it was clear from what she told me**

14     **that a zoning board meeting was imminent.  It was**

15     **going to happen soon.  I remember that.**

16                   Q.  And -- and -- and are you aware

17     now that the reason why this matter of the zoning

18     board came up, and the reason why this matter of

19     discussing it with you came up, is that -- it's

20     part of what she was doing on October 27th, 2005?

21                   **A.  I am aware that that's what Peggy**

22     **is alleging.  And I'm -- I'm aware that that would**

23     **have been part of her defense if she ever testified**

24     **of the removal hearing.**

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 146

1                    Silver - Direct - Ciotoli

2                    Q.   All right.   So, in other words

3     what -- what she's saying is that on the date of

4     October 27th, 2005, when -- when Mr. Bristol is

5     saying in the a.m. that she's at the trailer --

6                    A.   Yeah.

7                    Q.   -- grabbing his crotch, that she

8     in fact at least spent part of that time talking to

9     you about her zoning matter?

10                   A.   I am aware that that's what she

11    says.

12                   Q.   And you actually have a memory of

13    talking to her about the zoning matter?

14                   A.   I have a memory of talking to her

15    on a date.   I can't tell you when that date was.

16                   Q.   Okay.

17                   A.   I don't -- I can't tell you

18    whether it's on October 27th, 2005, or September

19    5th, 2005.   I just don't recall.

20                   Q.   I -- I mean, it's -- it's years

21    ago and -- and --.

22                   A.   I don't recall.

23                   Q.   Right.   Would you have anything

24    in your office, any record or file that would

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 147

1                    Silver - Direct - Ciotoli

2        somehow document that date?

3                    **A.   No.**

4                    Q.   Okay.  You know, on a -- on a

5        desktop calendar, or -- or in a legal pad, anything

6        where you might write, Peggy Mousaw came by to see

7        me today?

8                    **A.   No notation whatsoever.**

9                    Q.   Okay.  My -- my guess would be

10       that would be nonbillable time to Peggy, you were

11       just kind of doing it as a favor for her?

12                   **A.   She was not my client.**

13                   Q.   Right.

14                   **A.   I did that as a courtesy to her.**

15       **She's a county employee; she stopped me on the**

16       **street, asked me a question; and as you know in**

17       **your private life, people do that all the time, and**

18       **I just extended her that courtesy.**

19                   Q.   Right.  I mean, and the reason

20       for asking that is I understand there may not be a

21       billing entry, but sometimes we keep track of our

22       nonbillable time too.

23                   **A.   In this instance no -- no, I -- I**

24       **did not.**

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 148

1              Silver - Direct - Ciotoli

2              Q.   Okay.

3              A.   I did not -- there is no

4     notation, there is no record keeping, there is no

5     memorialization of any kind that I'm aware of,

6     that -- that reflects the meeting and when that

7     occurred with Peggy, so --.

8              Q.   Do you have any reason to quarrel

9     or dispute Peggy's recollection that this occurred

10    on October 27th, 2005?

11             A.   Other than it's -- it -- it's a

12    statement that that's when she claims that it

13    occurred.  I can't -- I don't know whether or not

14    that's true, because I said I don't remember when

15    it occurred.  So I have no idea whether or not

16    she's telling the truth.

17             Q.   Right.  I -- I mean, if she were

18    to present written evidence that she actually met

19    with the zoning board that night, that -- that

20    would help connect it --

21             A.   It would only --

22             Q.   -- together for you --

23             A.   -- it would only --

24             Q.   -- wouldn't it?

800.523.7887          08/18/2009, Colton, NY, Deposition of Andrew Silver Associated Reporters Int'l., Inc.

Page 149

1              Silver - Direct - Ciotoli

2                   A.   -- it would only suggest that she

3      had a meeting in the evening hours with the zoning

4      board.

5                   Q.   Would -- would you agree that

6      if -- if she's spending this period of time with

7      you in the morning, it makes it less likely that

8      she was at this construction trailer grabbing Mr.

9      Bristol's crotch; would --

10                  A.   No, I --

11                  Q.   -- you agree with that?

12                  A.   -- don't agree with that.   I

13     don't agree with that at all.   I drove from -- from

14     Canton to Colton this morning, it took me twenty

15     minutes at fifty miles an hour.

16                  Q.   Okay.   And when -- and when you

17     saw Peggy -- and again, without regard to the

18     date --

19                  A.   Uh-huh.

20                  Q.   -- when you saw Peggy on the --

21     on the street that day, was she coming from a work

22     location or a workplace?

23                  A.   I don't know where she was coming

24     from.   I just encountered her outside the