UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
SYRACUSE DIVISION

---

PEGGY MOUSAW,

                *Plaintiff,*

    -against-

BOARD OF EDUCATION of the COLTON PIERREPONT CENTRAL SCHOOL DISTRICT, STEPHEN KNIGHT, JEFFREY ANGLEBERGER, SHARON ANDREWS, SUSAN COLLINS, SHELLI PRESPARE-WESTON AND LAWRENCE PECK, Individually and in their capacity as School Board Members, MARTIN BREGG, Individually and as Superintendent of Schools, ANDREW SILVER, ESQ., Individually and in his capacity as Attorney for the Colton-Pierrepont Central School District, DAVID WHITE, Individually and in his capacity as Business Manager, District Treasurer and Investment Officer, and JEFF BRISTOL, Individually and in his capacity as Clerk of the Works,  PUBLIC SECTOR H.R. Consultants, L.L.C. and RONNI TRAVERS, and R.P. TROUTMAN AND ASSOCIATES, INC., Individually, and in their capacity as Investigators for the Colton-Pierrepont Central School District,

                *Defendants.*

**ATTORNEY AFFIRMATION**

**Case No.: 7:07-cv-01006 DNH-GJD**

---

**STEPHEN CIOTOLI, ESQ.**, being duly sworn, deposes and states as follows:

    1.    I am a member of the law firm O'HARA, O'CONNELL & CIOTOLI, counsel for the Plaintiff, Peggy Mousaw, in the above-captioned proceeding.

    2.    I make this affirmation in support of Plaintiff's Response to Defendants' Motion for Summary Judgment.  A total of three such motions for summary judgment have been filed

and Plaintiff has filed three opposition briefs in response thereto and response to the Separate Statements of Material Facts, but in addition, Plaintiff is attaching hereto some additional materials and sworn testimony referenced in the opposition briefs and other submissions.  Please also note that as Plaintiff annexes various exhibits hereto, such as the deposition testimony of all deponents, the 50-h transcript of plaintiff, the removal hearing testimony of Travers and Bristol, etc. that all moving defendants have done the same and therefore, with apologies, the Court will receive this volume of materials again, but in excerpted form, but can find the same testimony in all of the defendants submissions and exhibits, as well as here.

3. Following the Court's order on the prior motions to dismiss from all Defendants, the remaining causes of action as stated in the First Amended Complaint are:  the First Cause of Action against all Defendants for § 1983 violation of Plaintiff's First Amendment rights, the Second Cause of Action against all Defendants for retaliation in violation of First Amendment Rights, the Third Cause of Action against all Defendants for Defamation for publishing the false sexual harassment claims ("*grabbing the crotch*"), the Fourth Cause of Action for defamation against Defendant Bristol for the "*prostitute*" statement, the Fifth Cause of Action for defamation against Defendant White for the "*stealing*" statement, and the Sixth Cause of Action against Defendant Bristol for the "*breaking and entering*" into the construction trailer statement.. Annexed hereto as **Exhibit "A"** is a true and correct copy of Plaintiff's Verified Amended Complaint, with an exhibit attached thereto, Plaintiff's Notice of Claim dated on September 26, 2006.

4. Annexed hereto as **Exhibit "B"** is a copy of the pertinent portions of testimony of Plaintiff, Peggy Mousaw, where Plaintiff clearly and unequivocally denies that the incident of October 27, 2005 ever occurred and gives an airtight alibi that she never went near the

construction trailer that day, in both her 50-h testimony (Exhibit I) below and at her deposition. Please compare the two descriptions from Plaintiff and then compare also with Silver's testimony about seeing Plaintiff that morning regarding her zoning board issue.  But first, Plaintiff's flat out denial that the alleged incident ever occurred – a jury should hear this:

> "A.  He (Bristol) stated that I was, one, at his work trailer, which did not occur. Two, he stated I made, advances towards him, which did not happen. He stated I - - I grabbed him by the genitals, which did not occur.  Then he said something about – I don't know if it's that one or the other one, about having him on the grill or having him for breakfast, neither of those statements occurred either."  (See 50-h transcript Exhibit "I").

5.  Plaintiff was asked what she did on the day of October 27, 2005 and this was Plaintiff's testimony at the 50-h examination (Exhibit "I" pp. 17-22):

> Q.  *Now, let me ask you this, on October 27th, 2005, what did you do that day?*
>
> A.  *In July in 2005, my dad died.  We were dealing with my mom, going through the loss of my father.  September 14th was my mother's birthday, 2005, on that day I had a property that I bought, I had a landslide.  The bank sheered sixty-five feet by fifteen feet, and I lost a hundred-and-ten-thousand-dollar investment.  I was fighting with the Town of Colton to get a variance to move my house.  The insurance company in New York State informed me that they weren't going to pay for my landslide because there's no insurance company in New York State that covers landslide. So, I was looking at taking a personal loss on my investment.*
>
> *On October 27th, 2005, I had a meeting with the -- with the zoning board that evening, seven o'clock that night.  I was sick all night, physically sick.  I -- I had on October 3rd -- on October 5th, I received a notification from the code enforcement officer that a zoning board member had written a letter that they wanted me to pick up my house and move it across the road.  They weren't even going to let me keep it on my waterfront property.  I thought I was going to have to hire a lawyer and file an Article 78 against the -- against the town to keep my house.*
>
> *The October 27th was a day of my zoning board meeting.  I didn't sleep all night the night before.  Sick, throwing up, I thought I was going to lose everything that I invested in. I got up that morning at three-thirty.  I gathered some documents for the zoning board meeting that night.  About four-thirty I went to the cemetery, and I had a few words with my dad.  At five o'clock that morning I was at work.  I*

*went in, and I'll be honest with you I didn't get anything done. All I did is I looked at the documents all day long.*

*About twenty after eight my friend, Andrea Marotta, who is an attorney, came into my office.*

Q. *What's his last name?*

A. *She. Andrea Marotta, M-A-R-O-T-T-A, came into my office. And she brought me in a bagel that was burnt, and I had to throw it away because it was making my stomach turn. And she talked to me -- she's a lawyer, free advice. I asked her to look at my zoning documents. She looked at them, she said, "Peggy, you've got everything you need. Don't worry about it."*

*I -- I left my office about quarter after nine to go to my boss's office. My boss is the county administrator. I went to my boss --.*

Q. *What's his name?*

A. *I have -- we have -- I have a new boss, but at the time it was Donald Brining. I went over to his office to see if he needed anything. I didn't -- they didn't have anything for me. As I was walking back, I -- I was very depressed. I thought -- I was very concerned about this property that I owned, and as I was walking back from Donald Brining's office, I ran into Andy Silver on the sidewalk.*

*Andy asked me how things were going. I said, "well, Andy," I said, "I'm really worried. I think I'm going to have to file an Article 78."*

*And Andy says, "well, I got a few minutes. Why don't you come over to my office?" At the time, Andy was the county attorney. So, I got to Andy's office about ten o'clock, and I was with Andy Silver until about ten forty-five that morning. I left Andy Silver's office. I went back to my office. I worked on a highway project, a spreadsheet and a mortgage tax report that had to be prepared for the board of legislators.*

*I got done there. I left my house. I had to meet a -- I had a surveyor. I think his name might be Alfred. I'm not really sure what his first name is. Al Sweener from Plattsburgh. He was coming down to look at my property to see if -- the insurance policy said if it was a sinkhole collapse, they'd cover me. If it was a landslide, they wouldn't. So, I had this geological engineer come down to tell me whether or not he thought it qualified as a sinkhole collapse.*

*I was with him from -- he ran late -- I was with him -- he was supposed to be there at one o'clock, he didn't get there until a*
*little after one. He met me at my old house on Gulf Road, and I went with him down to my property, and we walked around the property, and up and down the*

> *hills, and he took pictures of the site. I was with him until about four-thirty. Then he came back with me to my house on Gulf Road, and I paid him for his services, and he left.*
>
> *I then got ready for the zoning board meeting. I showed up at the zoning board meeting about six-thirty. I ran into Joan Kilroy outside the zoning board. Joan Kilroy and I had a few -- discussed the, what was going on with my house. The zoning board showed up at seven o'clock. I was with them until about nine-thirty and then I walked home.*

Q.    So, on October 27, you never went to Mr. Bristol's job trailer or construction trailer?

A.    At no time.

6.    At Plaintiff's deposition (Exhibit "B") she testified as follows about what she did on October 27, 2005, the same as she did at the 50-h:

> *Q. The date of this alleged incident is October 27, 2005, is that correct?*
>
> *A. Yes, it is.*
>
> *Q. Could you tell me, what's the first thing you did when you woke up that morning?*
>
> *A. I didn't really sleep the night before. The first -- I had a property that had had a landslide --   Q. Uh-huh.*
>
> *A. -- and I had a zoning board meeting because the zoning board wanted me to move my house across the road from the property it sat on. So, I really hadn't slept the night before. And I -- I got up -- I finally gave up on trying to sleep about three thirty. I got up and I went to my dad's grave for a little while and then I went to work about five o'clock. I had to work seven hours a day because I needed comp time to get my -- because of my house problem. I was trying to juggle everything with my comp time and getting my work hours in without losing comp time. I went to work about five o'clock. I worked on a couple of --*
>
> *Q. Let me interrupt there. Were you -- when you went to work were you required to clock in or punch in?   A. No. Huh-uh. The --.*
>
> *Q. And this is your job with the county -- St. Lawrence County you're referring to?*
>
> *A. Correct.   Q. Okay. And where was your office located?*
>
> *A. My memory. I believe I was over in the public defender's building at that time.*

*Q. What's the street address?   A. 48 Court Street, but -- I don't know. It may have a different number.*

*Q. Okay.   A. Canton.*

*Q. And you arrived there at what time?   A. I got there about five o'clock.*

*Q. In the morning?   A. Yes.*

*Q. Did you see anybody when you arrived there?   A. Not initially, no.*

*Q. Did you have a key to enter the building or was it open?   A. Yes, I did.*

*Q. Okay. Was it an electronic key or a physical key?   A. Physical key.*

*Q. Okay. And what's the first thing you did when you got to work that day?*

*A. I got in about five o'clock and I spent the first two hours going through my documents for the zoning board meeting that night. I had a zoning board meeting scheduled for seven o'clock. And about a quarter of eight, my friend, Angela Valada, who's an attorney, came in. And she knew that I'd been upset about my whole house problem. And she had brought me a bagel and it was slightly burnt and the smell was just making me nauseous. And she looked at my documents and told me not to worry, that everything was going to be okay. And after she left I walked upstairs threw the bagel away. Then I walked over to see my boss, Don Brining, at the county administrator's office. That would have been about a quarter of nine. As I was coming back from Don's office, I ran into Andy Silver on the sidewalk. And Andy asked me how things were going and I told him I was pretty upset. Andy says, Well, what are you upset about? And I said, Well, this landslide and I think I'm going to have to file an Article 78 against the town of Colton. And then he says, Well, he says, I've got a few minutes. Why don't you get your stuff and come on over and I'll take a look at it for you? I said, All right. So, I went over to Andy's office and I was with him about -- we went into the -- I went in and he went in with me to the small conference room off to the side of his office. And I was there about forty-five minutes. And he reviewed my documents. He told me if I had a problem with the zoning board that I had pretty good documents and that if we had to -- you know, go to the meeting tonight, see what happened, and then if I had to file an Article 78, we'd talk about it after what happened at the meeting that night. So, I left Andy and then I went back to my office and work on a highway project, my mortgage tax project, and I left work about noon. I went home. I made a couple of phone calls, and I was waiting for Al Sweener from -- a geological engineer from Plattsburgh to come down. Al showed up. We spent four or five hours together that day taking pictures of my house because the insurance company refused to pay for a landslide in New York State but they would have paid for a sinkhole collapse. And I was trying to get them to say it was a sinkhole collapse so they'd pay for my house but he said it -- it wasn't. He left. A little after five I think I finished with him. I took a shower and went back down to my dad's grave for a while. Then I went to the zoning board meeting. I got there a little after six. I met Joan Kilroy, one of the zoning*

*board members outside -- talked to her for a few minutes -- waited for the rest of the zoning board members to come. Seven o'clock we go into the zoning board meeting. We don't have a quorum. I stayed there two hours talking to them about what I wanted to do and they told me do whatever it took to -- whatever I had to do to save my house. Go ahead and do it. Left the zoning board meeting. Went back to the cemetery, then I went home. (Exhibit "B" pp. 135-140).*

7.  At Plaintiff's deposition with regard to White accusing her of stealing, Plaintiff stated that White "*accused me of stealing the school's insurance binder that he'd given me.*" (Exhibit "B" pp. 257-258 and 321-323). This was at a public meeting of the Board sometime in 2006 where Plaintiff also made the very important point that *"(F)rom the time that the hearings started until my -- the end of my term, the Board meetings got brutal. There was -- I was fair game for anything they wanted to go after me for.*" (Id. at 258) In Defendant White's Affidavit he states that Plaintiff had the binder and that he asked for it back at a "public Board meeting," but that he never used the word stealing, although he states that Plaintiff used that word. (Affidavit of David White, sworn to December 22, 2009, ¶4.) Therefore, the two stories are almost identical except for who used the word stealing.

8.  Annexed hereto as **Exhibit "C"** is a copy of the pertinent portions of testimony of defendant, Andrew Silver ("Silver"), attorney for the District, in which Silver testified with regard to the report of Ronnie Travers from Public Sector H.R. Consultants, L.L.C., that "*there were parts of her report that I would have liked to have seen more follow-up on, and some more clarity to,*" such as:

- Having a forensic analysis done of Jeff Bristol's computer and log, in which Silver admits **"***it's something that the defense would use to argue that there's been some inappropriate manipulation of the records."* (Exhibit "C" p. 92)
- Next, Silver invokes Plaintiff's Constitutional right to remain silent on the advice of counsel, when he testified, "(t)*here was a statement in the report to suggest that -- that -- that Ronni may have been drawing -- Ms. Travers may have been drawing a negative conclusion, based on the fact that Peggy wasn't going to be*

- *interviewed by Ms. Travers, on the advice of her attorney. I think -- I think Ms. Travers drew a negative inference from that.*" (Exhibit "C" p. 81)
- Finally, Silver, who was responsible for retaining R.P. Troutman and Assoc ("Troutman") for the Voice Stress Analysis test ("VSA") of Bristol, learned at the removal hearing that the test was illegal in New York State, but allowed Travers to use the test results in her report to the Board anyway. . Silver, again had to admit that "*If I had to do it all over again would I -- would I conduct the V. -- have the V.S.A. conducted? The answer is no. I would have chosen a different route…Twenty-twenty hindsight, would have done it a different way.*" (Exhibit "C" p. 119)
- Silver claim that he did not know about the shortcomings of Traver's report until July 25th Board meeting, is contradicted in his own motion papers, where in Silver's Separate Statement of Material Facts no. 27, Silver states that "*Travers provided Bregg with PSHR's Investigation Report (PSHR's Report.) on June 14, 2006, a copy was provided to Silver shortly thereafter.*"  He was at the board meeting on July 11th when the report was presented to the Board and he had a copy of it shortly after June 14, 2006 – a copy, which by the way, was never given to Plaintiff until later.   (Exhibit "C" Deposition of Silver relevant pages 77-93; 97; 102-127, 202-209 and 210-211).

In sum, a forensic analysis of Bristol's construction log, should have been done, but wasn't, and there was a VSA "lie detector" test, which should not have been done, but was.

9. As a way to compare Silver's testimony on the shortcomings of Travers' investigation and report, with Travers own testimony at the removal hearing *(Exhibit "H")*, please see the following:

| Page | Summary of Transcript |
|---|---|
| 63-64 | Travers admitted that the fact that she was not able to interview Plaintiff did bear on the conclusions that she reached in her investigation.  Plaintiff has the right to not speak to the investigator |
| 81 | Travers admitted that there was no other document, other than a FOIL request submitted several days before the October 27, 2005 incident that in her mind placed Plaintiff at the construction trailer on October 27th. |
| 85 | Travers admitted that this FOIL request was a "*pretty important one*" and that she "*drew a big conclusion*" from it, but admits that she wasn't sure if she ever read the FOIL request herself or even had a copy of it and that maybe somebody just read it to her. |

| | |
|---|---|
| 88-89 | Travers admitted that she didn't know if the October 27, 2005 log entry by Bristol was ever opened or edited and doesn't know if the District ever had a computer expert check into that. In fact, no one has ever told Travers that the log entry was opened up after October 27, 2005 and edited. |
| 122 | Travers admitted that she never gave a copy of the sexual harassment complaint to Plaintiff before their meeting so Plaintiff never had a chance to review it. |
| 124 | The complaint was dated February 16, 2006 but was not provided to Plaintiff until March 29, 2006 (the date it was given to Plaintiff's prior counsel – Plaintiff actually received the complaint on April 1, 2006). |
| 126 | Travers admitted that it was her decision that she was not going to provide Plaintiff with a copy of the complaint until they had their face to face meeting. |
| 130-131 | Plaintiff has stated that Travers would say to her that this was a meeting and hearing using the words interchangeably and Travers admitted that she was aware that Plaintiff was of the belief that she was being called into a "*hearing*" but that Travers did not "*refute*" that. |
| 132 | Again, Travers admitted that she never said to Plaintiff "*this is not a hearing*" and again admitted that she never gave her a copy of the complaint leaving Plaintiff with the impression that the first time she would see this complaint against her was at a hearing against her. |
| 136 | Travers admitted that it appears that for Bristol the confrontation he had with Plaintiff in February 2006 was "*the last straw*" and that's what perhaps motivated him to make the complaint. |
| 138 | Travers admitted that Plaintiff had the right to an attorney and had a right to have an attorney present at the meeting. Please compare this to Travers report where she states that "*rather than meeting with the lead investigator to respond to questions…Peggy chose instead to engage legal counsel and to follow the advice of that counsel*" which in the report Travers found "*troublesome*." |
| 146 | Travers admitted that they never had "*the opportunity ... to get to an alibi*" from Plaintiff. |
| 148 | Travers admitted that PSHRC never did get a disk of Bristol's logs and never asked for one. |
| | (Portions of the removal hearing transcript are annexed hereto as Exhibit H") |

10.   Next, at Silver's deposition, we learned the reasons why Silver read the charges in public at the July 25th board meeting based on erroneous reasons, both legally and factually:

- First, Silver relied on the case of *Matter of Harold Company, Inc. v. Weisenberg*, 59 N.Y.2d 378 (1983), which states only that the <u>hearing</u> may be public and says nothing about reading the charges in public. Silver completely misreads the case, when in fact, the case supports plaintiff in this action that the hearing may be public, but that the mere presentation of unproven charges does not give *"license to publicize the intimate details of claimant's private lives."*
- Second, Silver relied on the advice of Ed Sarzynski, another attorney, about reading the charges in public, but admits that at most Mr. Sarzynski only said that the board vote should be in public, and as for reading of the charges verbatim in pubic, Silver testified *"I don't know if he went as far as to say that."* (Exhibit "C" pp. 204-205)
- Finally, Silver's reliance on Section 105 of the Public Officers Law is equally misguided, since Silver admits again when asked *"does Section 105 of the Public Officers Law say that tells you need to read these charges publicly? A. It -- it says -- first of all, it doesn't say that you have to read the charges publicly."* (Exhibit "C" p. 205)

11. Silver also provided a critical part of Plaintiff's alibi for October 27, 2005, where he corroborated Plaintiff's assertions that she was dealing with her zoning board issue following the landslide at her house and that during the morning of the 27th, she talked to attorney Silver about the zoning issue and her upcoming appearance before the zoning board that night. This particularly important in light of the fact that in Bristol's sexual harassment claim, he made it a point of changing Defendant White's written account of the alleged incident to note that it occurred in the "*a.m.*" (of course, this is before he changed his testimony at the removal hearing – please see below (Exhibit "H") and stated that he could no longer remember when the incident occurred). Therefore, for a good part of that morning, Plaintiff was with Defendant Silver in Canton discussing her zoning issue and not in Colton at Bristol's construction trailer –Silver's response to this in the Separate Statement no. 21 is basically that even if Plaintiff was with Silver that morning, she still had time to drive to Colton from Canton and meet her surveyor at noon. Plaintiff's description of her encounter with Defendant Silver regarding the zoning issue is

repeated almost verbatim by Defendant Silver in his deposition. (See Exhibit "B" pp 135-140 and Exhibit "C" pp 141-145).

12. Annexed hereto as **Exhibit "D"** is a copy of the pertinent portions of the testimony of defendant Martin Bregg, Superintendent of Schools, regarding his contacting County Administrator, Don Brining (Plaintiff's direct supervisor), in April or May of 2006 to inform him, as a "*courtesy,*" that Plaintiff, the Deputy Budget Director of the County, was accused of sexual harassment by a male employee of the school district. This was after Bregg heard Plaintiff on the radio discussing school issues and "*problems with the construction project.*" At that point in time, the claim of sexual harassment was just that, only a bare allegation, in which the investigation, if any, had hardly yet commenced. The investigator, Ronnie Travers from Public Sector H.R. Consultants, L.L.C., did not present her report to the Board of Education until July 11, 2006 and the Board did not bring the charges, with their attorney, Andrew Silver, announcing them to the public, until July 25, 2006. Now we know for the first time that Plaintiff's supervisor at the County knew about the sexual harassment claim against her some 2-3 months earlier. (Exhibit "D" pp. 327-330).

13. Perhaps even more astonishing is that Bregg testified that he told "*the executive council for the teacher's association,*" for the District, *c*onsisting of about five teachers, that Jeff Bristol was bringing a complaint against Plaintiff for sexual harassment sometime "*in the spring of 2006.*" When Bregg was asked at deposition:

> *Q. Okay. Were you concerned at all that you were telling five employees of the district that Peggy Mousaw was being accused of sexual harassment?*
>
> *A. No.*
>
> (Exhibit "D" pp. 249-259).

Bregg also informed the High School Principal, Randy Johnson, and Elementary/Special Education Principal Julie Welsh about the sexual harassment complaint by Bristol against plaintiff. (Exhibit "D" pp. 261-262).

14. Then, perhaps most egregious of all, Bregg and the District destroyed ("*trashed*") Bristol's computer, which contained the damaging log entries and the "*inappropriate manipulation*" of those log entries as Silver stated. We learned that the computer was trashed after Bregg's deposition testimony, in which he made the following critical statement:

> *A. No, all (Kardash – the District's IT guy)) knows is that the log was accessed after February 16th, but he couldn't identify what part of the log was changed. And he said that it could have been changing a word, correcting a word, and then making that change to the log, it could have been adding something to the log or deleting something from the log. All he could tell me was that the log was accessed after February 16th.*
>
> *Q. Okay. So, verbally, he said to you that, "I have determined that Jeff Bristol accessed this computer log after February 16th 2006?"*
>
> *A. Yes.*
> ....
> *Q. Okay, Did that raise a red flag for you?*
>
> *A. It raised a question of – that the log had been altered, but it didn't get me any further information, it was another piece…Or he could have changed a whole sentence, or added something (*like "Peggy Mousaw came into my office today")
>
> *A. That's a possibility.*

(Exhibit "D" pp. 190-200).

15. After inquiring further about the status and whereabouts of Bristol's computer, the following e-mail, dated September 22, 2009 (Annexed hereto as **Exhibit "E"**), was sent from Bregg to his counsel:

> *Claudia,*
>
> *No, the computer no longer exists. Bristol was provided one of the older models when he was hired. The district cycles out computers every three or four years. We also lost several computers and other electronic equipment a few years ago after power outage.* ***Those computers were trashed****.*
>
> *Martin*

This was after Travers report stated to the Board that a forensic analysis of the computer log should be done and after the issue of the construction log became an issue at the removal hearing, which both Silver and Bregg would have known, the District still destroyed this critical piece of evidence.

16. Annexed hereto as **Exhibit "F"** is a copy of the pertinent portions of the deposition of Stephen Knight ("Knight"), President of the Board of Education of the Colton-Pierrepont Central School District, regarding his various contacts with County personnel, supervisors and legislators regarding Plaintiff, including with County Administrator Don Brining (p. 138); County Treasurer Bob McNeil (pp. 141); Julie Deegon and Francine Perretta (both department heads at the County) (pp. 141 and 145); Jane Powers regarding an assessment issue raised by Plaintiff at a school board meeting (p. 146); and two County Legislators, Tedra Cobb (pp. 158-159) and one other legislator while Knight was interviewing for the County Administrator's job that Brining was vacating (p.155) – that is seven different individuals at the County by Knight's own admission that he talked to about Plaintiff; and even on one occasion when Knight felt the need to go to Plaintiff's office at the County to "*give her a head's up*" that if she kept saying things that "*aren't true*" at Board of Education meetings, he would have to call her on it (pp.151-152).  Knight also admitted at his deposition that every one of these contacts

involved some negative commentary about Plaintiff (pp. 145 and 159). (Exhibit "F" Deposition of Knight relevant pages 138-147 and 151-163)

17. Finally, on the issue of Traver's report to the Board, Board President Knight testified that at the Board meeting on July 11, 2006, when Travers presented her report to the Board, Travers stated "*that she felt Peggy was guilty*" and when asked if he questioned that conclusion, Knight said "*no*." (Exhibit "F" p. 99). Therefore, before the charges were even drafted, or voted on, or the hearing was held, or the evidence heard, with all the shortcomings of the Traver's report that Silver knew about, Travers told the Board that Plaintiff was "*guilty*." (Exhibit "F" Deposition of Knight relevant pages 99, 138-147, 151-163)

18. Annexed hereto as **Exhibit "G"** is the Sexual Harassment Policy and Regulation of the Colton-Pierrepont Central School District, which provides in pertinent part that: "*To the extent possible, within legal constraints, all complaints will be treated as confidentially and privately as possible. However, disclosure may be necessary to complete a thorough investigation of the charges, and any disclosure will be provided on a 'need to know' basis.*" And furthermore, the District's Regulation on the same states that "*Confidentiality of all reports of sexual harassment will be maintained.*"

19. Superintendent Bregg violated the school district policy on keeping sexual harassment charges confidential, when he stated that he called County Administrator Brining as a "courtesy," whereas the sexual harassment policy (Exhibit "G") states that disclosure may be made on an as need to know basis to complete a "thorough investigation," which clearly was not the case in Bregg making a courtesy call to Brining or telling the teachers or school Principals, who had nothing to do with any investigation, or were not even interviewed for this investigation.

20. Annexed hereto as **Exhibit "H"** are pertinent sections of testimony from defendants Ronnie Travers of Public Sector H.R. Consultants, L.L.C. (please see ¶ 9 above for Travers' testimony) and Jeffrey Bristol, Clerk of the Works, for the District taken from the removal hearing conducted on January 11, 2007 and March 16, 2007 at the District in Colton, New York.  Included in Bristol testimony was that:

- Bristol changed his story from the original sexual harassment complaint where he said it occurred in the "a.m." to say that "*today I can't remember if [the alleged incident of sexual harassment] was morning or afternoon*" and regarding giving a report of the incident to Defendant White, Bristol stated that "*I'm not sure that I might have been guessing at that point.  I've had a problem trying to remember whether it was morning or afternoon.*"  (Exhibit "H" pp. 209 and 289).

- Regarding the fact that a forensic analysis of Bristol's computer showed that he went back into his computer log and made a change in February 2006 at the same time he was making his sexual harassment complaint against Plaintiff, Bristol gave the unlikely explanation that the reason why he went in to change the log entry was to run a "*spell check,*" not realizing that Microsoft Word files maintain numerous types of "metadata," to include editing dates and times.  The metadata established that in fact Bristol had the October log entry opened for over an hour and he did "six different saves" all for a spell check?  (Exhibit "H" p. 194).

- Bristol stated on the issue of falsely accusing Plaintiff of breaking and entering into his construction trailer:  "*Well, Peggy was asking for information; the Board wasn't allowing her to it.  That was my thought, is that she was looking for information on my computer,*" and on that basis he told the Travers and "*the police*" that she broke into the construction trailer at night.  (Exhibit "H" p. 293).

(Exhibit "H" Removal Hearing relevant pages 148, 194, 209, 213-218, 278, 289 and 293)

21. Perhaps even more disturbing than Bristol's explanation for why he went into his computer log to change the entry for October 27, 2005 in February of 2006, which has now been confirmed by Bregg at his deposition, is the fact that the District then destroyed the hard drive from the computer ("trashed it") even after the District was put on notice about this valuable piece of evidence which is now gone for good.  This spoliation of evidence was intentional and deserves sanction by this court.  Please see Exhibit "E" for the e-mail from the District.

{W0147643.1}                                                     15

22. Annexed hereto as **Exhibit "I"** are pertinent sections of testimony from Plaintiff taken at the 50-h examination by counsel for the District defendants, Claudia Ryan, on August 20, 2007 specifically regarding her alibi on October 27, 2005 stated in full ¶ 5 above, which is virtually identical to her testimony at her recent deposition some two years later as shown in Exhibit "B."

23. Annexed hereto as **Exhibit "J"** is an unofficial copy of the minutes of the July 25, 2006 meeting of the Colton Pierrepont Central School District Board of Education. Said minutes were taken from the District's website on January 8, 2008, evidencing the fact that the District continued to publish the defamatory materials and make them available to the public at large. Interestingly, the minutes actually approved by the Board in August, 2006 did not contain a recitation of the defamatory remarks, although the minutes made available to the general public *did* contain such remarks.

Dated: January 22, 2010            s/Stephen Ciotoli_____
                                                   Stephen Ciotoli, Esq.
                                                   Bar Roll: 512228
                                                   O'HARA, O'CONNELL & CIOTOLI
                                                   *Attorneys for Plaintiff*
                                                   7207 East Genesee Street, Fayetteville
                                                   New York 13066
                                                   Phone: (315) 451-3810
                                                   Fax: (315) 451-5585
                                                   sdc@oharalaw.com